UNITED STATES, Appellee

v.

DAVID GUSTAVE SIPPEL, Colonel, U. S. Air Force, Appellant

4 USCMA 50, 15 CMR 50

Daniel S. Ring, Esq., and CAPT Cornell DeGrothy, USAF, for Appellant.

LT COL Harold Anderson, USAF, and CAPT Giles J. McCarthy, USAF, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by general court-martial at Bolling Air Force Base, Washington, D. C., and was found guilty of offenses proscribed by Articles of War 95 and 96, 10 USC §§ 1567, 1568, and Article 107, Uniform Code of Military Justice, 50 USC § 701. He was sentenced to be dismissed from the service and to forfeit all pay and allowances. The convening authority approved the findings and sentence and a board of review in the office of The Judge Advocate General of the Air Force affirmed. On May 27, 1953, we granted accused's petition for review, specifically limiting our consideration to the following issues: (1) Whether the court erred in admitting evidence of testimony given before a court of inquiry; (2) whether the law officer erred in failing to instruct the court that the sentence could not extend to dismissal; (3) whether the instruction as to the punishment imposable on Charge I was prejudicial; and (4) whether the convening authority complied with the procedure required by Paragraph 85c, Manual for Courts-Martial, United States, 1951, in taking action different from that recommended by his staff judge advocate.

Subsequent to our grant of the petition for review, the accused filed a motion for leave to file an additional assignment of error and the motion was granted. By this assignment the accused challenged the jurisdiction of this Court to review the case, contending that because he was separated from the service he is not a person subject to the Uniform Code of Military Justice and that the action against him has abated. We shall dispose of this contention before discussing the issues upon which the petition for review was granted originally.

### I

The accused was charged with having committed certain offenses during the period from November 24, 1950, to September 22, 1951. He was tried on June 3, 1952; the convening authority approved on September 5, 1952; and on February 18, 1953, a board of review in the office of The Judge Advocate General of the Air Force affirmed. Within the thirty days provided by law the accused filed a petition to have this Court review the proceeding. On April 1, 1953, while his petition for review was pending, but not acted upon, his commission as an officer in the United States Air Force expired. A few days prior to that date, the Staff Judge Advocate at Bolling Field, approached the accused and, after informing him that he was speaking on behalf of the Chief of Staff of the Headquarters Command, notified the accused in substance as follows: That his commission would expire by operation of law at midnight on April 1, 1953, pursuant to the provisions of the Armed Forces Reserve Act of July 9, 1952 (Public Law 476, 82d Congress, 2d Session), and Executive Order No. 10397, promulgated September 25, 1952; that he (the accused) would have no duty assignment after April 1, 1953; that he would receive pay through that date, but none thereafter; that he would have complete freedom of movement

thereafter; and that no written orders of separation, discharge, or release from active duty would be issued to him. The accused, by letter to the Secretary of the Air Force, contested the legal effect of the verbal notification. Moreover, he asserted that it was an attempt to effect a premature forfeiture of pay and allowances since the sentence adjudged by the court-martial would not affect that result until the date of the order directing execution of the sentence, which could not be issued until the completion of appellate review. The letter of reply, prepared in the Office of the Secretary of the Air Force, stated, in part, that an order relieving an officer from active duty is an administrative act which terminates the active duty status of an individual; and that such an order was not issued to the accused, nor to others in similar circumstances, because it was believed that any affirmative administrative action might abate the proceedings pending against them.

Defense counsel contend that the separation of the accused from the Air Force by operation of ▌ law divested this Court of ▌ jurisdiction to review the case. They concede that jurisdiction originally attached, but argue it could only be continued by the reappointment of the accused for an indefinite term pending the outcome of appellate review of his conviction. Specifically, they assert that the separation removed the accused from any of the categories of persons subject to the Code as enumerated in Article 2 thereof, 50 USC § 552. Furthermore, they contend that conceding separation, the only provision for continuance of jurisdiction beyond the term of service in the Armed Forces is found in Article 3 of the Uniform Code of Military Justice, 50 USC § 553; and, that that provision extends jurisdiction to offenses committed while the accused was subject to military law only if a sentence of confinement for five years or more could be adjudged and accused could not be tried for the offenses in the civilian courts. Accused concedes the provisions of Article 2 of the Code establish that up until April 1, 1953,

he was subject to military law. However, to support his contention that jurisdiction was divested by his change in status, he relies upon paragraph 11*d*, Manual for Courts-Martial, United States, 1951, which provides as follows:

> "*Effect of termination of term of service.*—Jurisdiction having attached by commencement of action with a view to trial—as by apprehension, arrest, confinement, or filing of charges—continues for all purposes of trial, sentence, and punishment. If action is initiated with a view to trial because of an offense committed by an individual prior to his official discharge—even though the term of enlistment may have expired—he may be retained in the service for trial to be held after his period of service would otherwise have expired. See Article 2(1)."

A close examination of the first sentence of that provision reveals that it states the rule contrary to accused's contention. Moreover, it would be an illogical and inconsistent rule of law which would permit an accused to petition this Court and assert rightly that we had jurisdiction to hear and rule on his assignments of error and then permit him successfully to contend that we lost jurisdiction because his petition delayed completion of appellate review until he was separated from the service. We are certain that accused would protest vehemently if we were to hold that his separation from the service denied him the right to have the record reviewed by us and yet that is the effect of his contention. Be that as it may, and aside from the Manual provision, the general rule has long obtained that jurisdiction once acquired is not lost by a change in the status of a defendant. The civilian rule, as stated in 14 Am Jur, Courts, § 195, at page 388, is that "jurisdiction once attached is not lost by the removal of the defendant from the jurisdiction." This principle has been adopted by military jurisprudence. In 1919 the Secretary of the Navy addressed an inquiry to the Attorney General as to whether court-martial proceedings could be instituted against a person who had been discharged from the naval service. In the course of his

**53**

opinion the Attorney General stated (31 Op Atty Gen 521, 528):

"It appears to be well settled, as said by the Supreme Court in *Carter* v. *McClaughry* (183 US 365, 383), that where jurisdiction has once attached it can not be divested by mere subsequent change of status, and that this principle justifies the trial and sentence of a person out of the service where jurisdiction has attached while he was in the service. *Coleman* v. *Tennessee,* 97 US 509; 16 Op 349, 352; *Barrett* v. *Hopkins,* 7 Fed 312; *In re Walker, supra; In re Bird, supra; In re Dew,* 25 Law Reporter, 538, 540; *United States* v. *Reaves,* 126 Fed 127, 131; Winthrop, Military Law, p 120; Dudley, Military Law, p 34; Davis, Military Law (1913 ed) p 59.

"This well-settled rule may be claimed to require the assertion of the same jurisdiction whether prosecution has been instituted before the defendant left the service or not. To this claim, however, there are two answers. First, the undoubted grant of jurisdiction to institute proceedings against a person in the service necessarily implied a grant of jurisdiction to carry the proceedings through to their legitimate end; second, by the institution of the proceedings the defendant acquires a new status; viz, that of a person under military charges, and this status he does not lose by the loss of his military status generally. *Carter* v. *McClaughry, ubi supra.*"

In Carter v. McClaughry, 183 US 365, 22 S Ct 181, 46 L ed 236 (1902), relied upon by the Attorney General in the above opinion, the petitioner had been convicted by a court-martial and sentenced to a dismissal, a fine of $500.-00, and confinement at hard labor for five years. The different provisions of the sentence became effective concurrently and in his petition for a writ of habeas corpus, it was contended that the punishments of fine and imprisonment were illegal because the petitioner had ceased to be an officer of the Army. The Supreme Court stated:

"The accused was proceeded against as an officer of the army, and jurisdiction attached in respect of him as such, which included not only the power to hear and determine the case, but the power to execute and enforce the sentence of the law. Having been sentenced, his status was that of a military prisoner held by the authority of the United States as an offender against its laws.

"He was a military prisoner though he had ceased to be a soldier; and for offenses committed during his confinement he was liable to trial and punishment by court-martial under the rules and articles of war. Rev Stat § 1361.

"It may be added that the principle that where jurisdiction has attached it cannot be divested by mere subsequent change of status has been applied as justifying the trial and sentence of an enlisted man after expiration of the term of enlistment (*Barrett* v. *Hopkins,* 2 McCrary, 129, 7 Fed 312), and the execution of sentence after the lapse of many years, and the severance of all connection with the army. *Coleman* v. *Tennessee,* 97 US 509, 24 L ed 1118."

Applying the above principle to the case at bar, we conclude that the jurisdiction of military tribunals over the accused attached while he was subject to military law; that it was not divested by his separation from the service; and that appellate proceedings may be continued to their legitimate end. We, therefore, overrule the additional assignment of error and proceed to discuss the issues upon which the original grant of review was based.

II

In view of the fact that the second and third issues are controlled by the same principles and that a disposition of one disposes adequately of the other, we shall consider them together. Prior to the reference of the charges herein to a court-martial for trial, the accused was a party to a court of inquiry which was convened to investigate his performance of duty, conduct, and behavior during the period January

54

1950 to December 1951. The issues considered by the court of inquiry were substantially the same as those involved in this litigation. During the hearing before the court of inquiry, the accused, after having been warned of his rights under Article 31 of the Code, 50 USC § 602, and at his own request, was sworn and testified to certain facts involving his complicity in these alleged offenses. At that time, he announced that in giving his testimony it was his understanding that the evidence could not be used against him because of the provisions of Article 50, Uniform Code of Military Justice, 50 USC § 625. The president of the court informed him that the admissibility of his testimony, if he were tried at a later date, would be determined by the forum trying the case and that an interpretation of the provisions of Article 50 was a matter which did not concern the court of inquiry. At the trial in the instant case, the reporter who had recorded the court of inquiry proceedings was called as a witness for the prosecution. Without going into details, suffice it to say she was permitted, over objection of the accused, to testify to the statements made by him during those proceedings. The essence of accused's objection was that Article 50 of the Code prohibited the Government from introducing the testimony. That Article provides:

"(a) In any case not capital and not extending to the dismissal of an officer, the sworn testimony, contained in the duly authenticated record of proceedings of a court of inquiry, of a person whose oral testimony cannot be obtained, may, if otherwise admissible under the rules of evidence, be read in evidence by any party before a court-martial or military commission if the accused was a party before the court of inquiry and if the same issue was involved or if the accused consents to the introduction of such evidence.

"(b.) Such testimony may be read in evidence only by the defense in capital cases or cases extending to the dismissal of an officer."

Narrowed down, the contention of defense counsel is that the testimony of the accused before the court of inquiry was the testimony of "a person whose oral testimony cannot be obtained" at the court-martial trial because his right against compulsory self-incrimination prevented the prosecution from obtaining his testimony. Hence, since the sentence imposable extended to dismissal, subsection (b) of Article 50 barred completely the admission of his court of inquiry testimony. In other words, his contention is that the test of whether the previous testimony can be used is established by the availability of the oral testimony and is not based on the presence or absence of the witness. Government counsel, on the other hand, contend that the true test for admissibility is found in the Manual statement to the effect that "A person's 'oral testimony cannot be obtained' in the sense of Article 50 if the person is dead, insane, too ill or infirm to attend the trial, beyond the reach of process, or cannot be found." (Paragraph 145b, page 272, Manual for Courts-Martial, United States, 1951). Because we conclude the quoted Article is not intended to apply to the testimony of a party, we need not reconcile those conflicting views.

Article 50 provides a method whereby the parties may produce evidence which, for a variety of specified reasons, is not obtainable. While the procedure may be likened to the procedure involving depositions, it is more closely associated with, and more aptly governed by, the principles controlling the use of former testimony. Fundamentally, a party should produce his evidence through live witnesses, but Congress realized that in certain instances to do so would be either impossible or impracticable. To overcome the difficulties encountered when testimony became unavailable because of death, insanity, distance, privilege, or otherwise, a substitute method was provided. The privilege to use the testimony was confined within narrow limits and the procedure could not be employed unless unavailability, brought about by one of the enumerated conditions, was affirmatively shown to exist. However, the reasons for creating a special or substitute method for establishing admissibility make it apparent that a showing is unnecessary and the

**55**

foundational conditions are unimportant if the evidence is otherwise admissible. By way of illustration, if a party seeks to establish a fact by a substitute method, the party against whom the testimony is offered must have been afforded an opportunity to confront the witness whose testimony is sought to be admitted. Confrontation of a witness is a valuable right, but it is difficult to see how that right can be taken from an accused when he is the witness testifying. He hardly need be afforded an opportunity to confront himself. Again, in many instances, confrontation may be satisfied by giving an accused the opportunity to cross-examine the witness upon the testimony to be offered in a subsequent trial. When the prosecution seeks to establish a fact by an admission or confession of an accused, it cannot be contended rationally that the evidence is inadmissible because he, the accused, was not afforded an opportunity to cross-examine himself. Wigmore, Evidence, 3d ed, § 1048, announces that principle in the following language:

"But, regarded from the point of view of the *legal rules of Admissibility,* the party's extrajudicial statements, like all other extrajudicial statements, are met and challenged by the Hearsay rule (*post,* § 1361). How is it, then (since they are nevertheless admissible against the party-opponent), that they are able to pass the gauntlet of the Hearsay rule?

"Very simply. The answer is that the party's testimonial utterances do *not* pass the gauntlet of the Hearsay rule when they are offered *for* him (unless they can satisfy some exception to that rule); but that they do pass the gauntlet when they are offered *against* him as opponent, because he himself is in that case the only one to invoke the Hearsay rule and because he *does not need to cross-examine himself.*"

Presented in a slightly different manner, pretermitting the question of voluntariness, an accused's confession is admissible whether judicial or extrajudicial. If we accept that premise, then we must look to the Code and the Manual provisions to determine if they con-

**56**

stitute a bar to the admission of the otherwise competent evidence. Article 50 is intended to require a party to lay a foundation to permit the introduction of hearsay evidence which without a proper foundation would be inadmissible. It would be requiring a useless act to compel a showing to establish competency on one ground when the evidence is competent for other reasons. A rule such as that would defeat the very purpose of Article 50 and others covering similar methods of producing evidence. Implicit in those enactments is an intent to make it practical to produce testimony and not an intent to make it impractical. That the purpose of the Article was to aid in the production of evidence and not to hinder its development is rendered more certain by the statements found in the Manual for Courts-Martial, supra, paragraph 145b, pages 271–272. That paragraph deals with previous testimony and it provides, in part, as follows:

"The limitations upon the use of former testimony noted above do not apply with respect to statements made at a former trial, or at any trial, which are admissible under some rule of evidence other than that authorizing the introduction of former testimony. Any such statement, for instance, a voluntary confession or admission of the accused or an inconsistent statement of a witness, may be proved by an admissible record or report of the trial at which it was made or by other competent evidence."

While that particular provision does not specifically mention testimony given before a board of inquiry, we find no rational basis for the framers of the Manual to draw a distinction between a confession given before a board and one made before a court. Clearly the reasoning for and against admissibility applies with equal force to any type of legal proceedings. Undoubtedly, members of Congress concluded that because of the difficulties peculiar to the military service, the use of depositions and previous testimony in court-martial cases should be extended beyond that permitted in civilian courts. At the same time it was realized that if the witness

was not to be produced in court by the Government, the accused might lose some benefit if the demeanor of the witness adversely affects the court-martial members. That deprivation was considered of sufficient importance that Congress concluded the maximum sentences which could be imposed in certain instances should be lessened, and that, when an accused was being tried for an offense which carried a death or dismissal sentence, he should not be denied the right to confront and cross-examine witnesses in the presence of the court-martial members. The reason behind that concept is that a court-martial can better assess a witness' credibility and more nearly determine the truthfulness of his testimony if he performs in front of the members. Most assuredly that reason would not be the basis for barring the confession of an accused as he is the principal actor in the drama, and he can perform if he so desires. For all the foregoing reasons, we conclude that Article 50 is not intended to bar the confession or admission of an accused if made before a court of inquiry.

So that there will be no uncertainty concerning the manner or method of obtaining the evidence before the board of inquiry, we stress the fact that accused does not contend there was any violation of the provisions of Article 31 of the Code. Neither compulsory self-incrimination nor coercive acts or conduct by Government agents are asserted and the record shows none. Prior to being sworn as a witness before the court of inquiry, the accused was fully warned of his right not to testify against himself and told that, if he did, his testimony could be used against him in a trial by court-martial. After a short recess the accused, who is a lawyer, announced that he understood the provisions of Article 31 and Article 50, and that he desired to testify. Thereupon, he voluntarily took the stand and related his participation in certain transactions during the period in question. Although the record indicates that he was influenced in his decision to testify by a belief that Article 50 would protect him, he was in error. He thoroughly understood his rights and

he apparently was willing to take the gamble for he was not pressed to talk. That may in part be due to the fact that under his interpretation he could not lose. He might influence the board of inquiry favorably by testifying in that proceeding and either his testimony would not be usable against him in a subsequent criminal proceeding or, if it were used, he could not be dismissed from the service, assuming he was convicted. He was not encouraged in his erroneous interpretation of the Article by the actions, remarks, or suggestions of any representative of the Government, and he was willing to assume full responsibility for his own construction of the law. He was mistaken as to the extent of the coverage afforded by the Article, but such a misconception cannot be made the basis of a claim of involuntariness.

### III

The next assignment of error complains of an instruction given by the law officer on the maximum sentence. After findings had been announced, the law officer instructed the court-martial on the sentence which might be adjudged. In order to place the probability of prejudice in its true perspective, we quote the relevant instructions:

"LAW OFFICER: Members of the court, since all the offenses of which the accused has been found guilty are not listed in the Table of Maximum Punishments in the Manual, I will advise the court of the maximum punishment which may be adjudged for the offenses of which he has been found guilty:

"As to Specifications 1, 2 and 3 of Charge I and Charge I: *The court might assess punishment, at their discretion, not in excess of dismissal,* and I quote that last clause from a decision in the case of the ·United States versus Downing, Case No. 266 of the United States Court of Military Appeals. In laying down this rule of thumb, the United States Court of Military Appeals used some loose language, because what they said, in effect, was that the members

of a court-martial had the authority to commute, which they do not have. In the Manual for Courts-Martial, U. S. Air Force, 1949, at page 96, it is stated: 'A sentence can not be commuted,' and then in parentheses they say, '(changed to punishment of a different nature) except by a confirming authority.' To the same effect is paragraph 105 in the Manual for Courts-Martial, United States, 1951. *Therefore, if you do not adjudge dismissal as a punishment for conviction of Charge I, you may not adjudge any other sentence under Charge I.*

"As to Specifications 1, 2 and 3 of Charge II, referring as a guide to Title 18, United States Code, Section 216, the maximum sentence which the court might adjudge is, as to each Specification, dismissal and total forfeiture of all pay and allowances, to become due after the date of the order directing execution of the sentence; confinement at hard labor for two years; and a fine of not more than $10,000.

"As to Specifications 1 and 2 of Charge III, the maximum sentence which the court might adjudge is dismissal, total forfeiture, and confinement at hard labor for one year.

"Therefore, the maximum punishment which might be imposed by this court on this accused is: dismissal; total forfeiture of all pay and allowances, to become due after the date of the order directing execution of the sentence; confinement at hard labor for eight years; and a fine of not more than $30,000." [Emphasis supplied.]

The three specifications under Charge I alleged improper acceptance of money on three separate dates, September 22, 1950, November 24, 1950, and January 24, 1951. Those particular offenses were set out as violations of Article of War 95, supra. In addition, under the three specifications of Charge II the same acts were alleged as offenses in violation of Article of War 96, supra. The two offenses of making false official oaths were alleged under Charge III as violations of Article 107, Uniform Code

of Military Justice, supra. There were two other specifications alleging other offenses under Charges I and II but, because of a finding of not guilty, they are of no importance to this problem. We, therefore, concern ourselves only with the eight specifications upon which a finding of guilty was returned.

The principal arguments advanced by the accused center around that portion of the instruction which informs the court-martial that if it does not adjudge a dismissal on Charge I, it may not impose any other sentence under that Charge. At first blush we encountered some difficulty in ascertaining the true purpose and meaning of the complete instruction and some uncertainty remains. In the first place, it appears to be inconsistent, as the first sentence informs the court-martial it may impose any punishment, in its discretion, not in excess of a dismissal. The last sentence, however, narrows the choice on that charge between dismissal or no punishment. Our duty is to reconcile any conflicts, if reasonably possible. Undoubtedly, the law officer was confronted with a difficult problem in attempting to convert a sentence of dismissal into some other type or form of punishment. It is a general principle of law that a court-martial cannot impose a sentence greater than was provided for by Congress at the time of the commission of the offense. What punishment may, or may not, be lesser than a dismissal is difficult to ascertain, and particularly is that true when converting that punishment to fines, forfeitures, and other penalties. However, the difficulty should not have driven the law officer to wander into a dissertation on commutation. Congress can change the penalty which may be imposed on one violating a criminal statute; and for this Court to hold, as it did in United States v. Downard, 1 USCMA 346, 3 CMR 80, that when Congress lowers the minimum penalty, an accused is entitled to the benefit of the reduction, does not amount to a holding that a court-martial may commute a sentence. In essence, we merely held in that case that a law officer should not instruct the court-martial that dismissal is mandatory when Congress has decreed other

types of punishment. There are substitute punishments which could be imposed under Article 133 of the Code, 50 USC § 727, which every reasonable person would conclude are not greater than dismissal. These could have been considered, as the only limitation imposed on the court-martial by the Congressional change in punishment was that it could not adjudge a sentence which was greater than that which could have been imposed at the time the offense was committed.

We are satisfied the last sentence of the first instruction given was not free from error, and we are willing to assume that standing alone it would be prejudicial to the accused. However, the general rule is that in considering the prejudicial effect of instructions they must be taken as a whole and interpreted in their entirety. It may be that when a clause is isolated or detached, it is prejudicial, but that effect may disappear when it is considered with others dealing with the same subject matter. We conclude that in this particular instance that rule is applicable and that when the instructional charge is considered as a whole, the erroneous phrase is rendered nonprejudicial. It is to be noted, and this subject will be later developed, that the law officer did not direct that dismissal from the service was mandatory under the finding on Charge I. Neither did he advise it was the minimum sentence which could be imposed. Had he done either, the rule announced in Downard would be controlling. Here, he advised the court members that it was within their discretion to adjudge a sentence on that Charge. His language did not force the court-martial to return any particular sentence as he combined all the charges and informed the court-martial that the maximum sentence it could return would be dismissal, total forfeitures, confinement at hard labor for eight years, and a fine of $30,000. He set no minimum punishment. The court-martial could have adjudged any sentence, from a one cent fine to the maximum set out by the law officer, without violating any instruction. It so happens that the court-martial selected dismissal from that over-all framework of punishment, but the sentence imposed can be supported by any one of the eight specifications; and there is no indication that the court-martial selected any particular charge to control the sentence.

Pursuing the principle one step further, and by breaking the instructions down to the individual charges, we find that under the findings of guilty on the three specifications alleged as violations of Article of War 96, the court-martial could impose a sentence of six years' confinement and a fine of $30,000. Under Article 107 of the Uniform Code of Military Justice, two years' confinement could be adjudged. Dismissal could have been adjudged, not only for the offenses alleged in the three specifications of Charge II and the two specifications alleged in Charge III, but also for the offenses alleged in the three specifications of Charge I. On the latter charge the court-martial could not combine a dismissal with a fine or confinement as that would be increasing the penalty after the offense had been committed. The law officer, therefore, correctly computed the maximum sentence on all charges and instructed properly. It may be that under the change in sentence authorized by Congress for the Article of War 95 offenses, a dismissal from the service could be converted into some other form of punishment without offending against the rule which prohibits increasing the severity of the sentence. If so, and pretermitting the question of multiplicity, the law officer may have erred on the maximum amount of fine and the maximum term of confinement that might be adjudged but that error would benefit the accused. However, in this instance, it was unnecessary to add to the maximum punishment by converting dismissal to other forms of punishment as the court-martial had ample latitude to adjudge an appropriate sentence under the other charges.

There are other persuasive reasons why the instruction on Charge I was not tantamount to directing the court-martial that dismissal was mandatory. We again mention the fact that the court-martial was informed that sentencing under Charge I was discretion-

**59**

ary and they were aware that the offenses alleged under the respective specifications of Charges I and II are merely different aspects of the same act. The court-martial could, therefore, assess a punishment for each act under either Article of War 95 or 96 as lessened, but not increased, by Articles 133 and 134 of the Uniform Code of Military Justice. It is important to note that under Article of War 96 the punishment which could be assessed for this offense could be greater than that permitted under Article of War 95, as the former would permit dismissal, total forfeitures, a fine, and confinement for six years, while the latter is limited to a dismissal. With that as a background, the court-martial was first informed that it might assess punishment in its discretion on Charge I, not in excess of dismissal. That portion of the instruction clearly does not require the court to dismiss the officer. The subsequent sentence of the instruction tells the court that if it does not adjudge dismissal for conviction of Charge I, it may not adjudge any other sentence on that Charge. There is no command in that sentence that the accused must be dismissed. On the contrary, it states that no sentence need be imposed. Had Charge I alleged the only offense of which the accused was convicted, then it might be argued that a court-martial would not find an officer guilty of three separate offenses of the gravity involved in the case and then not impose any sentence. Undoubtedly, under a one-charge prosecution, if a court-martial is given only a choice between no sentence and dismissal, it is arguable they would always select the latter. However, that is not the choice which was offered the court-martial members in this instance. If they chose dismissal, they could find support in the instructions on all three charges. If they chose less than dismissal, they had authority to do so under the instructions on Charges II and III. There was no requirement saddled on the court-martial members that they must assess a penalty under Article of War 95 and they were left entirely unfettered as to which charge they would select as their base for the sentence. At most they were told that if they adjudged a sentence

under Charge I alone, they could not impose any confinement or assess any fine. That amounts to saying that on that Charge there was no intermediate ground for sentence. But that was only part of the framework, and the intervening area was covered by other instructions. With a complete instructional framework before them, the court-martial members could conclude reasonably that they need not dismiss the officer. The entire punishment field was opened to them and if a dismissal was considered inappropriate and some other form of punishment was decided upon, they need not exercise their discretion to assess punishment under Article 95. They had up to eight years' confinement, total forfeitures, and $30,000 in fines to use for sentencing purposes; and they could use all, or any part, of that maximum. It would make little difference to the court-martial members which Charge was used as the basis for the sentence unless they intended to give a greater sentence than dismissal. In that event they could not adjudge the sentence under Charge I without considering other charges, but the converse is not true. If there is a mandate in the record, it is that Charge I could not be used to increase any fine assessed or any imprisonment imposed. We can find no prejudice in that command. Therefore, we overrule the contention that accused was prejudiced by the instructions on sentence.

### IV

The last assignment bears little discussion. The staff judge advocate made a comprehensive review of the law and the facts. He pointed out the overwhelming evidence against the accused and answered completely the legal questions raised. He disposed of all contentions raised by the accused in an adequate and legalistic manner. He, however, concluded that the instruction on the sentence was prejudicial and recommended a rehearing to correct that error. The convening authority disagreed and indicated on the record that his act in disagreeing with his staff judge advocate and in approving the findings and sentence was not inad-

vertent. He did not forward a letter setting forth his reasons, but they are obvious. For the purpose of this record, we will assume he should have done so, but his failure is of no materiality to the accused. Had the staff judge advocate been correct in his interpretation, we would have been required to grant a rehearing. We have, however, reached a result which is consistent with the act of the convening authority. The absence or presence of a letter in the record neither added to nor detracted from the issue raised before him as it was presented to us in bold relief and it was the only one involved. In the instant case, the accused was ably and adequately represented by experienced counsel at all stages of the proceedings and the record bespeaks a fair and just trial and a modest sentence. We, therefore, affirm the decision of the board of review.

Judge BROSMAN concurs.

QUINN, Chief Judge (dissenting):

I dissent.

The majority concedes error in the law officer's instruction on the sentence that could lawfully be imposed on Charge I. However, it attempts to minimize the error by referring to the punishment that the court could have imposed under Charges II and III. Such reference invites speculation only. If we are to guess at the reasoning used by the court in reaching its final sentence, we can just as easily and logically assume that the court decided to adjudge dismissal because of Charge I, and that it imposed forfeitures only on the basis of the remaining charges because it thought that forfeitures were a necessary concomitant of dismissal. Force is given to this assumption by the singular fact that no confinement was imposed, although the findings of guilty on Charges II and III would support a total of eight years' confinement. Since this theory is entirely reasonable, the accused should not be required to prove "through exploration of the member's mental processes, that . . . [the error] did in fact influence them." United States v. Yerger, 1 USCMA 288, 290, 3 CMR 22, 24. Accordingly, there was at least a fair risk of prejudice in the law officer's instructions on the sentence and, therefore, we should reverse the findings of the board of review.

I further disagree with the majority in its casual treatment of the failure of the convening authority to state his reasons for taking action different from that recommended by his staff judge advocate. It seems to me that the Manual's requirement that the convening authority state his reasons in writing when he disagrees with the recommendations of his staff judge advocate, is an integral part of the effort to overcome arbitrary and capricious action by a commanding officer. True, the convening authority's failure to adhere to the provisions of the Manual may not be the kind of omission that will provide a basis for reversal by this Court, but we should not place our stamp of approval on his dereliction.