## UNITED STATES ex rel. HIRSHBERG v. COOKE, COMMANDING OFFICER.

No. 231.   Argued January 13, 1949.—Decided February 28, 1949.

*John J. O'Neil* argued the cause for petitioner.   With him on the brief was *Harold Rosenwald.*

*Peyton Ford,* The Assistant to the Attorney General, argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Robert W. Ginnane, Robert S. Erdahl* and *Philip R. Monahan.*

MR. JUSTICE BLACK delivered the opinion of the Court.

This case raises important questions concerning the statutory jurisdiction of general courts-martial of the Navy.

In 1942 the petitioner was serving a second enlistment in the Navy. Upon the surrender of the United States forces on Corregidor petitioner became a war prisoner of Japan. After liberation in September, 1945, petitioner was brought back to the United States and hospitalized. He was restored to duty in January, 1946. March 26, 1946, he was granted an honorable discharge because of expiration of his prior enlistment. The next day he re-enlisted, obligating himself to serve four years "subject to such laws, regulations, and articles for the government of the Navy as are or shall be established by the Congress . . . or other competent authority . . . ."

About a year later, petitioner was served with charges directing his trial by a general court-martial of the Navy. The specifications included charges that during his prior enlistment the petitioner had maltreated two other naval enlisted men who were also Japanese prisoners of war and who were members of groups of prisoners working under petitioner's charge. Petitioner filed a plea in bar of the trial, one ground being that the court-martial was without jurisdiction to try him for alleged offenses committed during a prior enlistment at the end of which he had received an honorable discharge. His plea was overruled. He was acquitted on some specifications but was convicted on others that charged maltreatment. His sentence was ten months confinement, reduction from

chief signalman to apprentice seaman, and dishonorable discharge from the Navy.

Petitioner then brought this habeas corpus proceeding in a federal district court charging that the court-martial judgment was void because of want of statutory power to convict him for an offense committed if at all during his prior enlistment.[1] That court sustained petitioner's contention and ordered his release from custody. 73 F. Supp. 990. The Court of Appeals reversed, one judge dissenting. 168 F. 2d 503. The importance of the statutory construction, which appeared to affect the court-martial powers of the Army as well as the Navy, caused us to grant certiorari. 335 U. S. 842.

Aside from naval regulations to which reference will later be made, court-martial authority to try and to punish petitioner for his prior enlistment conduct primarily depends on the language in Article 8 (Second) of the Articles for the Government of the Navy (34 U. S. C. § 1200, Art. 8), which particularly provides that "such punishment as a court-martial may adjudge may be inflicted on any person in the Navy . . . guilty of . . . maltreatment of, any person subject to his orders . . . ." The Government contends that this language given its literal meaning authorized the court-martial to try and

---

[1] Court-martial jurisdiction to try petitioner depends on a part of Article 8 (Second), which reaches only conduct of an offender charged with "maltreatment of, any person subject to his orders." Before the court-martial and in the District Court petitioner contended that the court-martial was without jurisdiction in his case because the alleged maltreatment was of naval enlisted men who were not "subject to his orders" by virtue of his United States Navy obligations, but that whatever authority he then had over the other Navy men came from duties assigned him by the Japanese as a prisoner of war. Both the District Court and the Court of Appeals rejected this suggested interpretation of the Article, and the contention is not urged here.

to punish petitioner for conduct during a prior enlistment. It is pointed out that petitioner was "in the Navy" when the offense was committed and when he was tried; this language it is argued brings his case under the Article. In aid of this interpretation the Government emphasizes that during the whole period of time involved, petitioner was continuously "in the Navy" except for an interval of a few hours between his honorable discharge and his re-enlistment. This latter circumstance we think cannot justify the statutory interpretation urged. For if that interpretation is correct, court-martial jurisdiction would be satisfied if a sailor was merely "in the Navy" when the offense was committed and when brought before the court-martial, regardless of the duration of any interim period out of the naval service, provided the prosecution was not barred by the two-year limitation period provided by 34 U. S. C. § 1200, Art. 61.

The concessions made by the Government in urging such a literal construction of this Article expose the whimsical and uncertain nature of the distinctions that would mark the boundaries of court-martial powers. It is conceded that had petitioner not re-enlisted in the Navy after his 1946 discharge, no Navy court-martial could have tried him for offenses committed during his prior naval service. Thus, under the construction here urged, naval court-martial jurisdiction for a prior enlistment offense is made wholly to depend on whether the naval offender either voluntarily re-enters the Navy or is drafted into its service. And punishment of the gravest nature might be imposed on a naval volunteer or draftee which no court-martial could have imposed but for such a voluntary or forced entry into the Navy. For under this interpretation had the same naval offender re-entered his country's service by way of the Army rather than the Navy, either by choice or by accident of draft

assignment, no court-martial, either Navy or Army, could have punished him. Jurisdiction to punish rarely, if ever, rests upon such illogical and fortuitous contingencies. We therefore must look beyond the literal language of the Article, ambiguous at best, in order to determine whether this court-martial acted within its power. See *Runkle* v. *United States,* 122 U. S. 543, 555, 556; *Ex parte Reed,* 100 U. S. 13, 23.

While not itself determinative of the question here, 34 U. S. C. § 1200, Art. 14 (Eleventh), has greatly influenced the Army and Navy in determining their court-martial jurisdiction to try service personnel for offenses committed in prior enlistments. That Article provides that where any person previously discharged or dismissed from the Navy has "while in the naval service" been guilty of certain types of fraud against the Government, such person "shall continue to be liable to be arrested and held for trial and sentence by a court martial, in the same manner and to the same extent as if he had not received such discharge nor been dismissed."

Article 14 (Eleventh) stems from an Act of Congress passed in 1863, particularly designed to punish frauds against the military branches of the Government in connection with the procurement of supplies for war activities. 12 Stat. 696. That the attention of the 1863 Congress was directly focused upon the powers that could and should be vested in courts-martial is made clear by the debates and by the fact that Congress deleted from the bill as proposed specific provisions which would have made civilian government contractors subject to trial before military and naval courts-martial. Cong. Globe, 37th Cong., 3d Sess. 952–958 (1863), and Appendix to Cong. Globe, 37th Cong., 3d Sess. 199 (1863). See *Ex parte Henderson,* 11 Fed. Cas. 1067, No. 6,349 (C. C. D. Ky. 1878). And see *United States ex rel. Marcus* v. *Hess,*

317 U. S. 537, 539–545. But after elimination of certain provisions which would further have expanded court-martial jurisdiction, Congress left in the bill § 3, now Naval Article 14 (Eleventh), which makes naval personnel guilty of service frauds subject to court-martial after discharge or dismissal. The same 1863 provision has also been made applicable to Army personnel by Article of War 94, 10 U. S. C. § 1566.

Congress in this 1863 Act plainly recognized that there was a significant difference between court-martial power to try men in the service and to try former servicemen after their discharge. The Government correctly argues that the attention of the 1863 Congress was not focused on the precise question here, namely, the extent of a military court's statutory power to punish a man presently "in the service" for an offense committed in a prior enlistment period from which he has been discharged. But the fact remains that the 1863 Congress did act on the implicit assumption that without a grant of congressional authority military courts were without power to try discharged or dismissed soldiers for any offenses committed while in the service. Acting on this assumption, Congress granted such a power to courts-martial but only in the very limited category of offenses there defined—frauds against the Government.[2] Since the 1863 Act, Congress has not passed any measure that

---

[2] The discussion of the 1863 Act showed that Congress rather grudgingly conceded this comparatively slight expansion of the court-martial power apparently prompted by reports of particularly abhorrent recent frauds by war contractors, such as the supply of shells to the Army "filled not with the proper explosive materials for use, but with saw-dust." Cong. Globe, 37th Cong., 3d Sess. 955 (1863). This action of the 1863 Congress does not support an argument that Congress has been quick in response to appeals for expansion of court-martial jurisdiction. See *Duncan* v. *Kahanamoku*, 327 U. S. 304; *Ex parte Milligan*, 4 Wall. 2.

directly expanded court-martial powers over discharged servicemen, whether they re-enlisted or not.

Obviously Article 8 (Second), which subjects to court-martial jurisdiction persons "in the Navy," supports an argument that petitioner was subject to trial by this court-martial. It is equally obvious that the language of Article 8 (Second) particularly in view of Article 14 (Eleventh) supports an argument that this court-martial could not try petitioner for an offense committed prior to his honorable discharge. Under these circumstances the manner in which court-martial jurisdiction has long been exercised by the Army and Navy is entitled to great weight in interpreting the Articles.

The question of the jurisdiction of a naval court-martial over discharged personnel was submitted by the Secretary of the Navy to the Attorney General in 1919. The precise question of whether re-enlistment could revive jurisdiction of a military court was not considered, but as to the power of military courts over discharged personnel in general the Attorney General reached the conclusion that a person discharged from the Navy before proceedings were instituted against him "for violations of the Articles Governing the Navy, excepting article 14" could not "thereafter be brought to trial . . . for such violations, though committed while he was in the service." 31 Op. Atty. Gen. 521, 529. This conclusion of the Attorney General relied on statements of the Judge Advocate Generals of the Army and Navy that their offices had "from the beginning and uniformly held that a person separated from the service ceases to be amenable" to military and naval jurisdiction. Previous to the Attorney General's 1919 opinion neither the Navy nor Army had ever claimed court-martial power to try their personnel for offenses committed prior to an honorable discharge where proceedings had not been instituted before dis-

charge. See Winthrop, Military Law and Precedents 93 (2d ed. 1920). The Government concedes that the Army has always so construed its court-martial jurisdiction whenever the question arose. And the Government concedes that the Navy also followed this view of its jurisdiction until 1932.[3] Many holdings and opinions of Army and Navy authorities are cited to support these concessions. The Government's brief quotes the following language by the Navy Department in one of the cases which considered the precise issue raised here. The case appears in CMO 12–1921, p. 11.

"Except in cases of offenses in violation of Article 14 of the Articles for the Government of the Navy, there is no authority of law giving jurisdiction to a court-martial to try an enlisted man for an offense committed in a prior enlistment from which he has an honorable discharge, regardless of the fact that he has subsequently reenlisted in the naval service and was serving under such reenlistment at the time the jurisdiction of the court was asserted."

Accepting as we do the long-standing Army and Navy interpretation of the Articles previously referred to, an interpretation which necessarily would deny jurisdiction to the court-martial here, there remains the contention that the Navy has by a recent congressionally authorized regulation acquired such jurisdiction for its courts-martial. 34 U. S. C. § 591 authorizes the Secretary of the Navy, with the approval of the President, to adopt and alter regulations and orders for control of the Navy.

[3] Since 1932 the Navy has consistently adhered to its revised interpretation of Art. 8 (Second). In 1934 the Navy Department incorporated this revised interpretation in an official Navy publication, *Naval Courts and Boards,* and this interpretation became § 334 (a) of *Naval Courts and Boards* (1937 ed.).

218

The Government claims that a regulation adopted pursuant to this authority has been promulgated,[4] and that it vested the necessary power in this court-martial to try petitioner. This authorized regulation, it is contended, had the force of law, *Ex parte Reed,* 100 U. S. 13, 22, and consequently supplants the prior statutes which, as interpreted, had denied the jurisdiction here asserted. There has been considerable argument as to whether the language of the Navy regulation was sufficiently precise to endow it with the force of law. Passing over this argument, however, we are not able to agree that the Navy could in this manner acquire the expanded court-martial jurisdiction it claimed. For we cannot construe 34 U. S. C. § 591 as permitting the Navy to extend its court-martial jurisdiction beyond the limits Congress had fixed. *United States* v. *Symonds,* 120 U. S. 46, 49–50.

The regulation stands no better if it be considered merely as an evidence of a revised naval interpretation of the Article. This revised naval interpretation was given in 1932. Before that time, both Army and Navy had for more than half a century acted on the implicit assumption that discharged servicemen, whether re-enlisted or not, were no longer subject to court-martial power. The Attorney General of the United States had proceeded on the same assumption. And see *United*

---

[4] The regulation appearing in the 1937 *Naval Courts and Boards* § 334 contained the following language:

". . . Except for offenses provided for in article 14, A. G. N., a court martial may not try an individual who has been formally separated from the Navy and is no longer in the service unless proceedings were instituted against him while he was in the service. . . . Similarly, the Navy Department has passed cases as legal in which enlisted men have been convicted by court martial of offenses committed in a previous enlistment, although such offenses were not provided for in article 14, A. G. N."

*States* v. *Kelly,* 15 Wall. 34, 36. Under these circumstances, little weight can be given to the 1932 separate effort of the Navy to change the long-accepted understanding of its statutory court-martial power. For should this belated naval interpretation be accepted as correct, there would be left outstanding an Army interpretation of its statutory court-martial powers directly opposed to that of the Navy. Since the Army and Navy court-martial powers depend on substantially the same statutory foundations, the opposing interpretations cannot both be right, unless it be assumed that Congress has left each free to determine its own court-martial boundaries. We cannot assume that Congress intended a delegation of such broad power in an area which so vitally affects the rights and liberties of those who are now, have been, or may be associated with the Nation's armed forces.

*Reversed.*