UNITED STATES, Appellant

v

JAMES C. GALLAGHER, Sergeant, U. S. Army, Appellee

7 USCMA 506, 22 CMR 296

No. 8541

Decided January 18, 1957

*First Lieutenant Arnold I. Burns* argued the cause for Appellant, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant Russell L. Brenneman, Jr.*

*Captain John F. Christensen* argued the cause for Appellee, Accused. With him on the brief were *Colonel J. M. Pitzer* and *Lieutenant Colonel Stanley F. Flynn.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was convicted by general court-martial of two offenses of unpremeditated murder, in violation of Article of War 92, 10 USC § 1564 (1946 ed) ; three offenses of mistreatment of fellow-prisoners of war, in violation of Article of War 96, 10 USC § 1568 (1946 ed) ; one offense of collaboration with the enemy, in violation of the 96th Article of War, 10 USC § 1568 (1946 ed) and Article 134 of the Uniform Code of Military Justice, 10 USC § 934; and one offense of misconduct as a prisoner of war, in violation of Article 105 of the Uniform Code, 10 USC § 905. He was sentenced to dishonorable discharge, total forfeitures, and life imprisonment, and the convening authority approved. The board of review ordered the charges dismissed because it concluded the court-martial did not have jurisdiction to try the accused for the offenses charged. The Judge Advocate General of the Army certified this issue for our consideration and it is the sole question presently before us.

On November 2, 1950, while serving in combat with the 8th Cavalry Regiment in Korea, the accused was captured by the Chinese Communists. It is alleged that the murders and other atrocities of which he was convicted occurred while he was a prisoner of war. On August 27, 1953, he returned to the hands of the American Forces as a result of Operation "Big Switch." After his exchange, the accused returned to the United States where he was granted leave. Upon return from leave in October 1953, he requested re-enlistment for a period of three years. Pursuant to his request, he was processed for discharge in accordance with special standards prescribed by the Department of the Army for soldiers who desired re-enlistment. His prior term of enlistment, as extended by Presidential Order, had expired October 12, 1951, although he continued to remain subject to military jurisdiction while in enemy hands and at least until he was discharged from his then current enlistment. Charges were preferred on October 22, 1955, and the crucial question in this case is whether court-martial jurisdiction as to the offenses committed during his prior enlistment was lost by reason of an honorable discharge dated October 27, 1953.

The general rule is that court-martial jurisdiction over military personnel subject to the Code is terminated by a discharge from the service which returns the serviceman to the civilian community, and that jurisdiction as to offenses committed during the period of service prior to discharge is not revived by reentry into the military service. Hirshberg v Cooke, 336 US 210, 69 S Ct 530, 93 L ed 621 (1949); Manual for Courts-Martial, United States, 1951, paragraph 11a, page 14. The theory here appears to be that military persons, and those who serve with, accompany, or are dependent upon them, are subject to military jurisdiction only so long as they remain such, and that when that status is legally terminated they are no more subject to that jurisdiction than is any other member of the civil community. The board of review held that this case could not be distinguished from Hirshberg, supra; that Article 3(a) of the Uniform Code of Military Justice, 10 USC § 803, the only other possible basis of jurisdiction, had been ruled unconstitutional by the Supreme Court; and that no military jurisdiction existed as to these offenses.

In Hirshberg v Cooke, supra, the defendant, an enlisted man serving in the Navy, was captured by the Japanese and remained a prisoner of war until his liberation by American Forces in 1945. He was hospitalized for a time and restored to duty in January of 1946. On March 26, 1946, he was honorably discharged from the Navy because his term of enlistment had expired, and re-enlisted in the Navy the following day. Approximately one year later, he was tried upon charges of maltreatment of other prisoners under his charge during his confinement as a prisoner of war. Naval Regulations then in effect make it plain that Hirshberg was given an abbreviated processing procedure applicable to those desiring immediate re-enlistment and never actually received a discharge certificate. Nevertheless, the Supreme Court applied what we earlier chose to label the general rule, holding that a hiatus had occurred in the service of Hirshberg, and concluded that he was not amenable to trial by court-martial for the offenses committed during his preceding enlistment.

In this case, Gallagher was accorded the abbreviated processing procedure authorized for persons who contemplate immediate re-enlistment in the Army; for example, he was not given a final type physical examination. His re-enlistment papers recite that he re-enlisted as of 9:00 a.m., October 28, 1953. His honorable discharge was withheld from his physical possession until after he had re-enlisted even though it purported to be effective as of October 27, 1953. Nonetheless, the board of review held that a hiatus had occurred in his service because his term of enlistment had expired, and thereafter, he had a free choice either to accept the abbreviated discharge procedure and immediately re-enlist, or to be discharged in the regular manner and later apply for re-enlistment at his convenience.

## II

Each counsel at this level contends with much vigor that the Supreme Court holding in Hirshberg, supra, supports his theory of the case. Because we believe that jurisdiction may be found to exist upon other grounds, we need not burden this opinion with our interpretation of the law announced by the Supreme Court in that case with respect to jurisdiction under what is now Article 2 of the Code, 10 USC § 802. Instead, we will turn to the development of another basis for concluding that the board of review erred in its decision, and Hirshberg v Cooke, supra, will be discussed only insofar as it is pertinent in that aspect.

Certainly we are not as easily convinced as was the board of review that there is no basis on which to found court-martial jurisdiction over this accused, for we believe Congress enacted legislation which permits military courts to try offenders who never really left the service between the time of the commission of the offense and the date of trial, and that this legislation is constitutionally valid when limited to the kind of situation presently before us. For the purposes of this part of our discussion, we will assume, arguendo, that there

508

was a nine-hour hiatus in the service of the accused.

Article 3(a) of the Uniform Code, supra, provides:

"(a) Subject to section 843 of this title (article 43), no person charged with having committed, while in a status in which he was subject to this chapter, an offense against this chapter, punishable by confinement for five years or more and for which the person cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia, may be relieved from amenability to trial by court-martial by reason of the termination of that status."

We have not the slightest doubt but what Congress passed this statute for the principal purpose of covering the situation brought about by the decision in Hirshberg v Cooke, supra. The legislative history demonstrates beyond question that the attention of the 81st Congress was focused on this precise issue, namely, the extent of a military court's statutory power to punish a man in the service for an offense committed in a prior enlistment period from which he had been discharged. This premise we will document at some length in the succeeding paragraph.

The following discussion may be found in the House Hearings on the Uniform Code (Hearings before House Armed Services Committee, 81st Congress, 1st Session, on H. R. 2498, page 617). Dr. Edmund M. Morgan, Jr., represented the group which had drafted the legislation at the request of the Secretary of Defense. Mr. Elston, while not a member of the subcommittee which considered the Uniform Code, had long been active in the field of military justice, and was invited by the Chairman of the House Armed Services Committee to sit in with the committee.

"MR. ELSTON. I would like to ask you this question. I think it was since you completed your hearings that a case has been decided by the Supreme Court of the United States.

"DR. MORGAN. The Hirshberg case?

"MR. ELSTON. Yes. To the effect that a person who has left the service, that is, who has been separated from the service, cannot be tried subsequently by a military court for an offense committed prior to such separation.

"MR. KILDAY. Even though he has reenlisted?

"MR. ELSTON. Even though he has reenlisted.

"DR. MORGAN. That is right.

"MR. ELSTON. Now, you have not anything in your bill covering that?

"DR. MORGAN. One thing we have about that is in the case of desertion. If he has deserted in the earlier service, then the fact that he has been discharged from a later service does not deprive the court of jurisdiction.

"MR. ELSTON. Yes. He may have even committed a murder within 3 days of his separation from the service.

"DR. MORGAN. That is right. We have not covered that.

"MR. ELSTON. He reenlists and cannot be tried for it.

"DR. MORGAN. That is right.

"MR. ELSTON. I think this committee can write something into the law that will take care of that ridiculous situation.

"DR. MORGAN. Of course, the Supreme Court put it on the basis of the interpretation of the present statute, as I remember it, and that is that Congress did not intend to have the jurisdiction exercised over the man after he had once been discharged.

"MR. ELSTON. Well, I do not think Congress ever intended anything of the kind.

"DR. MORGAN. I know, but that is what they said. There was not anything in the statute which saved the jurisdiction, and, of course, they interpreted it that way."

Later, Colonel Frederick Bernays Wiener, in the course of a statement before the subcommittee, mentioned Hirshberg v Cooke, supra, saying (House Hearings, supra, page 800):

"He was a naval chief charged with mistreating American fellow prisoners in the Philippines. His term of enlistment expired in March '46; he was

given an honorable discharge; reenlisted the next day, and thereafter his offenses came to light. The courts held there was no jurisdiction to try him after his reenlistment. So, in effect, they gave the honorable discharge which was issued by a 2½ striper at the Brooklyn Navy Yard, who, of course, couldn't know what Hurtzberg [sic] had done in the Philippines, in effect, as a pardon. The courts specifically said there was no constitutional question. I think that ought to be buttoned up."

When the committee members were considering the proposed enactment article by article, they focused their attention on Article 3(a) and the following exchange took place (House Hearings, supra, page 1262):

"MR. SMART (reading):

Subject to the provisions of article 43—this will be too long to write down, Mr. Chairman—any person charged with having committed an offense against this code punishable by confinement for 5 years or more and for which the person cannot be tried in the courts of the United States or any State or Territory thereof or of the District of Columbia while in a status in which he was subject to this code, shall not be relieved from amenability to trial by court-martial by reason of the termination of such status.

Now, that will get the Hirshberg case where he reenlisted. It would get Hirshberg even though he had not reenlisted.

"MR. BROOKS. That will close up that loophole?
"MR. SMART. In my opinion it will, sir.
"MR. BROOKS. What is your opinion?
"MR. ELSTON. I am inclined to feel it would.
"MR. BROOKS. All right, if there is no objection, then, we will adopt that language."

Accordingly, it is abundantly clear that Congress intended to preserve jurisdiction over men like Gallagher. The statute is so framed as to leave no doubt

that it is sufficient to effectuate that result. The only remaining question, therefore, is whether Congress was constitutionally empowered to work the desired change in military law.

We are well aware that in Toth v Quarles, 350 US 11, 76 S Ct 1, 100 L ed 8 (1955), the Supreme Court held that Article 3(a), in so far as it attempted to authorize the trial by courts-martial of ex-servicemen who are civilians at the time of trial, was unconstitutional, but that holding must be considered in the light of the issues involved. There the accused had severed all of his connections with the military service and had reverted to a civilian status prior to apprehension. Judging by the record, he was out of the Air Force for all purposes. Here we are presented with a situation where the accused was in the service when he committed the offense and when he was convicted. Gallagher elected to cast his lot with the military a second time, Toth did not. From our interpretation of that opinion, we do not believe the Supreme Court intended to say that Congress could not provide for trial in a military court of a person who, for all practical purposes, was continuously a member of an armed force. On the contrary, we conclude that the Supreme Court was dealing with a person who had returned to the civilian community and whose prosecution had no reasonable relationship to discipline and morale of the armed service. Certainly the following statement leads to that conclusion:

"None of the other reasons suggested by the Government are sufficient to justify a broad construction of the constitutional grant of power to Congress to regulate the armed forces. That provision itself does not empower Congress to deprive people of trials under Bill of Rights safeguards, and we are not willing to hold that power to circumvent those safeguards should be inferred through the Necessary and Proper Clause. *It is impossible to think that the discipline of the Army is going to be disrupted, its morale impaired, or its orderly processes disturbed, by giving ex-servicemen the benefit of a civilian*

court trial when they are actually civilians. And we are not impressed by the fact that some other countries which do not have our Bill of Rights indulge in the practice of subjecting civilians who were once soldiers to trials by courts-martial instead of trials by civilian courts." [Page 21. Emphasis supplied.]

There is nothing in the opinion to indicate that the same result would have been reached by the Supreme Court if Toth had elected to re-enlist in the Air Force contemporaneously with his discharge and prior to his arrest. Indeed, other portions of the opinion seem to indicate that Article 3(a) would not have been viewed as unconstitutional if Toth had stood in the position occupied by Hirshberg some six years earlier. The following language taken from the opinion illustrates our preceding statement:

"This Court has held that the Article I clause just quoted authorized Congress to subject persons actually in the armed service to trial by court-martial for military and naval offenses. Later it was held that court-martial jurisdiction could be exerted over a dishonorably discharged soldier then a miltary prisoner serving a sentence imposed by a prior court-martial. It has never been intimated by this Court, however, that Article I military jurisdiction could be extended *to civilian ex-soldiers who had severed all relationship with the military and its institutions*. To allow this extension of military authority would require an extremely broad construction of the language used in the constitutional provision relied on. For given its natural meaning, the power granted Congress 'To make Rules' to regulate 'the land and naval Forces' would seem to restrict court-martial jurisdiction to persons who are actually members or part of the armed forces." [Emphasis supplied.]

There is a sound basis for concluding that even though Article 3(a) offended against constitutional guarantees in that instance it should be regarded as constitutional when applied in a situation such as this. By Article I, Section 8, Clause 14, of the Constitution, Congress was granted the power "To make Rules for the Government and Regulation of the land and naval Forces," and to make all laws which were necessary and proper to carry those rules into execution. The Supreme Court has ever been mindful of the need for the Armed Forces to maintain good order and discipline within the military community itself. The entire body of military law and the system of courts-martial is based on that premise and its validity when properly used has often been upheld by the Supreme Court. Dynes v Hoover, 20 How 65 (US 1858); Kahn v Anderson, 255 US 1, 41 S Ct 224, 65 L ed 469 (1921); Gusik v Schilder, 340 US 128, 71 S Ct 149, 95 L ed 146 (1950). In the present case, Gallagher is, after all, a member of the military service at the present time, just as he was at the time when the offenses were committed. Assuming that a short hiatus occurred in his service, his day to day contact with other servicemen was continuous, and an inability to deal with his delinquencies, committed during a prior enlistment, would clearly have an adverse impact on the morale and discipline of his fellow soldiers who kept faith with themselves and with each other in the face of adversity, and on good order among those who presently serve. The services are filled with enlisted men who make military life a career and they re-enlist upon expiration of their term of service, which normally in the Army is every three years. Laying aside the statute of limitations, there is no good reason why prosecution should be barred so long as the person committing the offense never really severed his relationship with the service for any practical purpose, whether or not a short hiatus appears as a matter of record. We are mindful of the teaching of Toth v Quarles, supra, that the scope of the constitutional power of Congress to authorize trial by court-martial must be limited to " 'the least possible power adequate to the end proposed.' " When the caveat is given a reasonable application in this instance, however, we are led to the conclusion that Article 3(a) is constitutional. As

**511**

limited by us, the Article does not authorize any jurisdiction over the person which is not necessary and proper for the success of the services in accomplishing their mission.

We cannot and should not close our eyes to the fact that the alleged offenses occurred at a time when the accused was a prisoner of the enemy, and that he is not the first American whose activities during that time led to prosecution. United States v Dickenson, 6 USCMA 438, 20 CMR 154; United States v Batchelor, 7 USCMA 354, 22 CMR 144. These and similar incidents led to the promulgation of a formalized Code of Conduct by the President—one which reaffirmed the duty of every serviceman to resist this Nation's enemies, in mind and spirit, in combat and captivity, to the bitterest of bitter ends. Executive Order 10631, August 17, 1955, 20 FR 6057. What, then, are we to say to those who did thwart the enemy and his designs while in captivity? Must they serve side by side with others such as this accused, who informed, and collaborated, and murdered—and benefited thereby? Will not discipline, morale and good order suffer measurably if one who murders his compatriot can remain in the service and escape punishment because he re-enlists before his crime is detected? Should the authority of military justice to punish the wrong done depend upon the illogical and fortuitous contingency of an intervening honorable discharge when it is delivered only after the accused has re-enlisted in the service? The answer should be obvious—and is to us.

In Hirshberg v Cooke, supra, the Supreme Court itself indicated that a legislative enactment such as Article 3 (a), which would preserve jurisdiction over servicemen despite the existence of a hiatus in their service, would be constitutional. In that case, the Supreme Court first found certain inconsistencies in the statutes authorizing the exercise of Naval court-martial jurisdiction, and then turned to the long-standing military rule that an interruption in the period of service terminates jurisdiction for prior military offenses. Based on the construction adopted by the services that an honorable discharge

precluded prosecution, the Court concluded that such a gap existed in the service of the defendant, and that the court-martial did not have jurisdiction. It then went on to consider the question of whether a particular Naval Regulation preserved jurisdiction in such instances in so far as Naval personnel were concerned, despite the existence of a hiatus. The Court decided that Congress had not authorized the Navy to extend its courts-martial jurisdiction beyond the limits which Congress itself had fixed, but of more importance here is that it nowhere suggested that a congressional enactment which worked such a change would be unconstitutional. The thrust of the decision is in the contrary direction, for there would be little need to be concerned with the effect of Departmental regulations if Congress could not constitutionally authorize them. The following quotation illustrates our point here (336 US 210, 218–219):

"The regulation stands no better if it be considered merely as an evidence of a revised naval interpretation of the Article. This revised naval interpretation was given in 1932. Before that time, both Army and Navy had for more than half a century acted on the implicit assumption that discharged service men, whether re-enlisted or not, were no longer subject to court-martial power. The Attorney General of the United States had proceeded on the same assumption. And see United States v Kelly, 15 Wall (US) 34, 36, 21 L ed 106, 107. Under these circumstances, little weight can be given to the 1932 separate effort of the Navy to change the long-accepted understanding of its statutory court-martial power. For should this belated naval interpretation be accepted as correct, there would be left outstanding an Army interpretation of its statutory court-martial powers directly opposed to that of the Navy. Since the Army and Navy court-martial powers depend on substantially the same statutory foundations, the opposing interpretations cannot both be right, unless it be assumed that Congress has left each free to deter-

mine its own court-martial boundaries. We cannot assume that Congress intended a delegation of such broad power in an area which so vitally affects the rights and liberties of those who are now, have been, or may be associated with the Nation's armed forces."

We therefore conclude that we are free to, and do, decide that Article 3(a) is constitutional when applied so as to preserve jurisdiction over discharged servicemen who have re-enlisted.

For the foregoing reasons, the issue certified by The Judge Advocate General of the Army is answered in the affirmative.

QUINN, Chief Judge (concurring):

A discharge from the military service is not an adjudication that the person discharged has not ▬▬▬▬▬■ committed an offense during the period of his service. Nor does it operate as a pardon for any offense that has in fact been committed. United States v Landers, 92 US 77, 23 L ed 603. The simple question then is whether, in the circumstances of this case, the military can try the accused for an offense allegedly committed by him during the period of a prior enlistment.

In Hirshberg v Cooke, 73 F Supp 990 (1947) (sub nomine Hirshberg v Malanaphy), 168 F2d 503, ▬▬▬■ (CA2d Cir) (1948), 336 US 210, 93 L ed 621, 69 S Ct 530 (1949), the same question was considered by the Federal courts. The opinion by the District Court, the two opinions by the Court of Appeals for the Second Circuit, and finally that of the United States Supreme Court, indicate clearly that the only question for determination was the scope of the then existing "statutory jurisdiction" of the Navy to try a person after a discharge. That also was the import of my dissent in United States v Solinsky, 2 USCMA 153, 7 CMR 29, as it affected the right of the Army to try an enlisted man after his discharge.

Neither the Federal courts in the Hirshberg case, nor I in the Solinsky case, passed upon the power of Congress, under the Constitution, to continue court-martial jurisdiction over persons who, after discharge, re-enter the military service. As the principal opinion points out, Congress enacted Article 3(a) to cover the re-enlistment situation. Certain other situations were also covered by the Article. See Article of War 94, 10 USC § 1566 (1946 ed); Article 14, Articles for the Government of the Navy, 34 USC § 1200. In Toth v Quarles, 350 US 11, 100 L ed 8, 76 S Ct 1 (1955), the United States Supreme Court held that Article 3(a) was unconstitutional as applied to discharged persons who returned to civilian life and had no further connection with the military. However, the majority of the court was very careful to emphasize that its ruling was limited to the attempted application of the Article to "ex-servicemen" or "civilians like Toth." Ibid, pages 13, 14, 23.

One who re-enlists in the service after a discharge is not "like Toth." On the contrary, his position is like that of a person who leaves the country after committing a crime. During the time he is outside the jurisdiction he cannot be tried. But if he returns, he can, subject to the Statute of Limitations, be tried and convicted for an offense committed by him before his departure. From that point of view, the time hiatus between discharge and re-enlistment is completely immaterial. See Judge Frank's opinion in the Hirshberg case, 168 F2d 503, 508, Footnote 6. Accordingly, I agree with the conclusion that Article 3(a) grants to the military the authority which was lacking at the time of the Hirshberg and Solinsky cases, and that this grant of authority is constitutional. Paragraph 11a of the 1951 Manual which purports to establish a different rule is, therefore, incorrect.

FERGUSON, Judge (concurring):

As I read it, Toth v Quarles, 350 US 11, 76 S Ct 1, 100 L ed 8 (1955), does not cover a situation such ▬▬▬■ as we have confronting us in this case; i.e., where a serviceman commits an offense in one enlistment, is discharged, re-enlists, and is tried for the offense in the subse-

quent enlistment. I feel this is true despite any hiatus between the two enlistments, subject only to the Statute of Limitations imposed by Article 43, Uniform Code of Military Justice, 10 USC § 843. As the Supreme Court was careful to point out in Toth, supra, Article I of the Constitution, military jurisdiction cannot be extended over civilian ex-soldiers who have severed all connections with the military. In this case the Court said:

". . . It has never been intimated by this Court, however, that Article I military jurisdiction could be extended to civilian ex-soldiers who had severed all relationship with the military and its institutions. To allow this extention of military authority would require an extremely broad construction of the language used in the constitutional provision relied on. *For given its natural meaning, the power granted Congress* *'To make Rules' to regulate 'the land and naval Forces' would seem to restrict court-martial jurisdiction to persons who are actually members or part of the armed forces."* [Emphasis supplied.]

Rather, the language of that opinion carefully restricts the holding of the case to *civilian ex-servicemen* like Toth:

". . . We hold that Congress cannot subject *civilians like Toth* to trial by court-martial. They, *like other civilians,* are entitled to have the benefit of safeguards afforded those tried in the regular courts authorized by Article III of the Constitution." [Emphasis supplied.]

Since the accused here was not a civilian at the time of the offense or at the time of his trial, but instead, during both instances, was within the jurisdiction of the military, he may now be tried by court-martial.