UNITED STATES

v.

**Jackie L. McCORMICK, 448 64 9266, Sergeant (E–5), U. S. Marine Corps.**

**NMCM 81 1769.**

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 19 Dec. 1980.

Decided 29 June 1982.

LT Michael M. McReynolds, JAGC, USNR, Appellate Defense Counsel.

---

LCDR John C. Vinson, JAGC, USN, Appellate Government Counsel.

Before BAUM, Senior Judge, and ABERNATHY and MICHAEL, JJ.

MICHAEL, Judge:

Appellant was convicted at general court-martial, pursuant to his pleas, of the larceny of a wallet containing approximately $40.00 and seventeen specifications of uttering a forged check, violations of Articles 121 and 123, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 921 and 923, respectively. Members sentenced appellant to a bad-conduct discharge, six months confinement at hard labor, forfeiture of $250.00 pay per month for six months, and reduction to paygrade E–1. The convening authority approved the sentence as adjudged—which was within the sentence-limitation provisions of the pretrial agreement.

The record shows that appellant had found the wallet of another service member, removed the military identification card, altered the picture, and used the card to open a checking account under the other service member's name. When appellant stole the wallet which is the subject of Charge I, he also removed the identification card and in similar fashion used the card to open a second bogus checking account. Between 5 February 1980 and 14 April 1980, appellant cashed seventeen checks drawn upon these two accounts. Amounts varied between $30.00 and $300.00, with the majority of the checks valued at $100.00. In most instances the payee was the Marine Corps Exchange, although some checks were written to the Vance Air Force Base Exchange. Charges were preferred on 29 October 1980. Appellant assigns two errors for our consideration, the second of which we summarily reject. The first assignment of error, however, requires some discussion.

I

THE COURT–MARTIAL LACKED PERSONAL JURISDICTION IN THAT ALL THE OFFENSES OF WHICH APPELLANT WAS CONVICTED WERE COMMITTED PRIOR TO HIS DISCHARGE FROM AND SUBSEQUENT REENLISTMENT TO [sic] THE U. S. MARINE CORPS WHICH IMPOSED A BAR TO SUBSEQUENT TRIAL. *UNITED STATES v. GINYARD*, 16 USCMA 512, 37 CMR 132 (1967).

Appellant enlisted in the U. S. Marine Corps on 1 September 1976 for a four-year term. Consequently, the expiration of appellant's obligated service was 29 August 1980.[1] Appellant served over three years of active duty as a machinegunner but desired training from the armed services which would be somewhat more practical in a civilian climate. After career/reenlistment counseling, appellant chose to reenlist before the termination of his original obligated service in order to enter training in the field of accounting. Appellant also testified that on 15 April 1980 he reenlisted for a term of three years. Defense Exhibit (DE)–M, a DD214N, shows that appellant's date of separation or discharge was 16 April 1980. A ceremonial certificate of reenlistment, DE–Z, was dated 15 April 1980. Appellant did not receive a bonus for reenlistment, and although he testified that he did not sell back accrued leave, DE–M shows that appellant was paid for 40.5 days of accrued leave.

In light of these facts, appellant's assignment of error raises an issue which has been the subject of nearly thirty-five years of extensive argument, litigation, and legislative debate. To date, a serious question still remains: whether, in light of the rule announced in *United States v. Ginyard*, 16 U.S.C.M.A. 512, 37 C.M.R. 132 (1967), a conditional discharge and immediate reenlistment before the expiration of one's original obligated service is a "discharge" which, saving those offenses within the ambit of Article 3(a), U.C.M.J., 10 U.S.C. § 803(a), terminates personal jurisdiction by courts-martial over all offenses committed before separation? After an examination of a

1. *Marine Corps Separation and Retirement Manual* (MARCORSEPMAN) 6009.1.

long line of civil and military judicial opinions; the legislative history of Article 3, U.C.M.J.; pertinent service regulations which effect early, conditional discharges and reenlistments; the implicit policy considerations underlying all of these; and a recent opinion by the Army Court of Military Review, we must conclude that subsequent application of *Ginyard* does not extend to a situation where a service member's military status is unchanged by a conditional discharge and immediate reenlistment before expiration of the original term of obligated service. To support this conclusion, we begin with an analysis of the evolution of the rule of *Ginyard* and personal-jurisdiction parameters for courts-martial.

Courts-martial are deeply rooted in history. War is a grim business, requiring not only hazard of life and limb but also sacrifice of ease, opportunity, freedom of personal choice, and liberty of action. Experience has demonstrated that military law must be capable of prompt punishment to redress crime and that this is a universally recognized purpose of courts-martial. Its ability to do so bears directly on the state of discipline and morale within the armed forces. *See United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955) (J. Reed, dissenting); Winthrop, Military Law and Precedent, 2d Ed. (reprinted 1920).

Congress' authority to establish the parameters of courts-martial jurisdiction is founded in the U. S. Constitution, article I, section 8, clauses 14 and 18. *See Johnson v. Sayre,* 158 U.S. 109, 15 S.Ct. 773, 29 L.Ed. 914 (1895); *Dynes v. Hoover,* 61 U.S. (20 How.) 65, 15 L.Ed. 838 (1858). The framers of the Constitution thus have entrusted Congress with the delicate task of balancing and adjusting the constitutional rights of servicemen to military demands of discipline and duty. *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953).

Consequently, a court-martial is the exclusive tool of Congress, *Ex parte Wilson,* 33 F.2d 214 (4th Cir. 1929), and its jurisdiction cannot be extended beyond the limits which Congress has fixed by statute. *U. S. ex rel. Hirshberg v. Cooke,* 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621 (1949). *See generally* 11 Vand.L.Rev. 249 (1957).

It is undisputed that servicemen are subject to courts-martial only by virtue of their military status. *Billings v. Truesdell,* 321 U.S. 542, 61 S.Ct. 737, 88 L.Ed. 917 (1944); *Givens v. Zerbst,* 255 U.S. 11, 41 S.Ct. 227, 65 L.Ed. 475 (1921); *In re Morrisey,* 137 U.S. 157, 11 S.Ct. 57, 3 L.Ed. 644 (1896). This emphasis upon military status surfaced in early Congressional debates on the original counterparts of the Articles of War, art. 94, when Congress first addressed the issue of giving the Army court-martial jurisdiction over discharged persons. As Senator Howard noted, "A man's liability to punishment by court-martial must necessarily depend on his status, that is whether he is in the military forces . . . or whether he is not . . . ." Cong.Globe 37th Cong., 3d Sess. 952 (1863). This policy led to the judicial rule that termination of military status traditionally barred military prosecution for offenses committed prior to discharge, *Mosher v. Hunter,* 143 F.2d 745 (10th Cir. 1944); *Ex parte Drainer,* 65 F.Supp. 410 (N.D.Cal. 1946), even where a serviceman immediately reenlisted. *Hirshberg v. Cooke, supra; United States v. Lucas,* 19 C.M.R. 613 (1955). *See generally,* 11 Vand.L.Rev., supra at 251; Snedeker, *Jurisdiction of Naval Courts-Martial over Civilians,* 24 N.D.L.Rev. 490, 519 (1949).

The decision in *Hirshberg v. Cooke* instigated Congress, during its unified codification of military law in 1951, to address specifically the instances of military jurisdiction over offenses committed prior to discharge where a serviceman immediately reenlisted. The legislative result of this concern was Article 3(a), U.C.M.J.[2] Several

---

**2.** "Subject to Section 843 of this title, no person charged with having committed, while in a status in which he was subject to this chapter, an offense against this chapter, punishable by confinement for five years or more and for which the person cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia, may be relieved

sources address the legislative intention of Congress when drafting Article 3(a), U.C. M.J. Suffice it to say that, with concern for the serious nature of the crime and the statute of limitations, Congress' clear intention was to close the jurisdictional gap of *Hirshberg v. Cooke*.[3] *See generally* Index and Legislative History, Uniform Code of Military Justice (1950); *United States v. Gallagher*, 7 U.S.C.M.A. 506, 22 C.M.R. 296 (1957).

By all interpretations, Article 3(a), U.C. M.J., reinstated court-martial jurisdiction over numerous discharged servicemen including those who had reenlisted. The U. S. Supreme Court did not, however, uphold this extensive legislative sweep of military jurisdiction for those who had completely reverted to civilian status. In *United States ex rel. Toth v. Quarles, supra*, the Court held that Congress cannot subject civilians like Toth[4] to trial by court-martial. Justice Black, writing for the majority, reasoned that, like other civilians, Toth was entitled to the safeguard benefits afforded those tried in courts established by the U. S. Constitution, art. III. *Id.* 350 U.S. at 23, 76 S.Ct. at 8.[5]

Unlike the situation where a former service member has completely and finally reverted to civilian status, certain needs of the military must be considered when jurisdiction over reenlistees is at question. In instances where an offender is currently a member of the military services, just as he was at the time of the offenses, his day-to-day contact with other servicemen is continuous, and an inability to deal with his delin-

quencies, committed during a prior enlistment, would clearly have an adverse impact on the morale and discipline of fellow service members who kept faith with themselves, with their country, and with each other in the face of adversity, and on good order among those who presently serve. *United States v. Gallagher, supra* at 511, 22 C.M.R. at 301. It is unquestionable that morale and discipline in the services would be disrupted by allowing criminal offenders to escape justice and continue to serve as members of the military community. Several commentators and authorities view this consideration as the foundation for the enactment of Article 3(a), U.C.M.J. *See* 11 Vand.L.Rev., *supra* at 252. Still, several cases have grappled with the actual parameters of military jurisdiction over reenlisted service members for offenses committed in their prior enlistments. These interpretations and analyses of Article 3(a), U.C.M.J.; *Toth v. Quarles, supra*; and *Hirshberg v. Cooke, supra*, within the various facets of differing factual circumstances, clearly demonstrate the evolution of a doctrine of courts-martial jurisdiction which reflects the important policy concerns that balance military necessities with the Constitutional safeguards noted in *Toth v. Quarles*.

The U. S. Court of Military Appeals first addressed the issue of court-martial jurisdiction over a discharged and subsequently reenlisted servicemember in *United States v. Solinsky*, 2 U.S.C.M.A. 153, 7 C.M.R. 29 (1953). The extensive discussion by Judge Latimer in the lead opinion reflects many of the Congressional and Supreme Court

---

from amenability to trial by court-martial by reason of the termination of that status." Article 3(a), Uniform Code of Military Justice (U.C. M.J.)

**3.** *Hirshberg v. Cooke*, 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621 (1949), is generally cited for the proposition that, absent Congressional authority, one who is honorably discharged at the expiration of his period of enlistment cannot be court-martialed for an alleged offense committed within such period, even though he may have *immediately reenlisted.*

**4.** "After serving with the United States Air Force in Korea, Robert W. Toth was honorably discharged. He returned to his home in Pitts-

burgh and went to work in a steel plant. Five months later he was arrested by military authorities on charges of murder and conspiracy to commit murder while an airman in Korea. At the time of his arrest, Toth had no relationship whatsoever with the military." *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 13, 76 S.Ct. 1, 3, 100 L.Ed. 8 (1955).

**5.** Some of these safeguards which Justice Black discussed included the independent nature of the article III trial judiciary, the right to jury trial, and the right to indictment by grand jury. *Toth v. Quarles, supra* at 15–20, 76 S.Ct. at 4–7.

policy considerations noted earlier. The focal point of Judge Latimer's analysis was *Hirshberg v. Cooke*; paragraph 11, *Manual for Courts-Martial, 1951*; and previous military judicial authority.[6] This focus was Judge Latimer's foundation for extrapolating the general rule of jurisdiction and its exceptions which now appear in paragraphs 11a and 11b, *Manual for Courts-Martial, 1969 (Rev.)*, (MCM).

Judge Latimer concluded that the Congressional and judicial keystone for court-martial jurisdiction was the service member's status. Consequently, the question for resolution in *Solinsky* addressed the continuity of an accused's military service and asked whether the accused had at some point actually reverted to civilian status. *Id.* at 158, 7 C.M.R. at 34. The Court reviewed appropriate service regulations and concluded that a soldier who enters into an arrangement with the Government to discharge him for the given purpose of reenlistment should not be permitted to claim a lapse in service. The accused's discharge is conditional upon compliance with reenlistment and would, without that subsequent compliance, be a voidable, fraudulently obtained discharge. *Id.* at 159, 7 C.M.R. at 35. Cogent considerations of reenlistment practicalities support Judge Latimer's reasoning:

Clearly, the only purpose for a discharge and reenlistment prior to the expiration of the then existing term of enlistment is to facilitate the administration and effectuation of a continuous term of service. It is not intended to return a soldier to a civilian status and then have him once again become a soldier, rather it is intended that the military status be not interrupted. The whole complexion of the proceedings argue against an interrupted status. The discharge was not delivered until the reenlistment had been accomplished; there was not a break in service or pay; the accused could have been ordered to perform a special mission covering that period; he was entitled to every benefit incidental to membership in the armed forces; there was not a fraction of a second that he was not subject to military orders or military control; and every fact and all circumstances point to a situation where the discharge and reenlistment were to be simultaneous events for the sole purpose of preventing a hiatus or break in the service. Under the regulations and under the procedure outlined, one term could not end until the other commenced. If, by analogy, we compare the arrangement with a commercial contract, it was an extension before the end of the term. The only change was an extension of the term.

*Id.* at 159–160, 7 C.M.R. at 35–36.

Subsequent cases followed the reasoning of *United States v. Solinsky, supra*, addressing pertinent service regulations, delivery of discharge, actual reversion to civilian status, and any conditions which may have attached to an accused's discharge. A review of the cases merely clarifies and emphasizes the policy considerations of *Solinsky* and the rule enunciated therein: courts-martial maintain jurisdiction over service members who are conditionally discharged in a manner which clearly intends to prevent reversion to civilian status. *See United States v. Griffin*, 13 U.S.C.M.A. 213, 32 C.M.R. 213 (1962); *United States v. Brown*, 12 U.S.C.M.A. 693, 31 C.M.R. 279 (1961); *United States v. Frayer*, 11 U.S.C.M.A. 600, 29 C.M.R. 416 (1960); *United States v. Martin*, 10 U.S.C.M.A. 636, 28 C.M.R. 202 (1959); *United States v. Lucas*, 19 C.M.R. 613 (A.B.R.1955); *United States v. Isidore*, 7 C.M.R. 595 (A.F.B.R.1953).

The Court of Military Appeals addressed the holding in *Toth v. Quarles, supra*, in the landmark decision of *United States v. Gallagher*, 7 U.S.C.M.A. 506, 22 C.M.R. 296 (1957). Judge Latimer again authored the lead opinion which held that Congress, by enacting Article 3(a), U.C.M.J., intended to provide for continuous jurisdiction in cases

---

6. *See* paragraph 11a and b, *Manual for Courts-Martial*, 1951, and paragraph 11a and b, *Manual for Courts-Martial 1969, (Rev.)* (MCM); *United States v. Aikens and Seevers*, 5 BR–JC 331 (1949).

where a discharged serviceman had reenlisted. Concurring opinions by Chief Judge Quinn and Judge Ferguson extended Judge Latimer's reasoning somewhat. Arguing that Article 3(a), U.C.M.J., was unconstitutional only as applied to ex-servicemen or civilians who had severed *all* connections with the military, they felt that Article 3(a), U.C.M.J., may be constitutionally applied to one who has been unconditionally discharged and who subsequently reenlists *regardless of any hiatus between* enlistments (emphasis added).

A synthesis of the preceding cases leads us to the conclusion that by 1962 a clear post-*Hirshberg/Toth*/Article 3(a) rule had evolved for court-martial jurisdiction over service members who were discharged and subsequently reenlisted, *i.e.*, where the service member's discharge was conditional upon reenlistment and where the status of the service member was unchanged, courts-martial retained jurisdiction.[7] This rule is a clear reflection of the balanced policy considerations of the importance of the military mission, service members' morale, the individual's actual status, and constitutional safeguards which lie at the historical base of court-martial jurisdiction. However, three cases which followed this juncture have cast doubt upon the validity of a conditional discharge and reenlistment rule.

In *United States v. Noble*, 13 U.S.C.M.A. 413, 32 C.M.R. 413 (1962), the accused had twice been granted extensions of his original six-year enlistment. Later, the accused applied for cancellation of the two extensions and restoration of the original date of enlistment termination in order to gain certain benefits not available under his extensions. Chief Judge Quinn, speaking for a majority which included Judge Kilday, noted that "... legally and factually the new

term enlistment was only a substitute for the original enlistment .... Manifestly, we are not dealing with an accomplished separation for the purpose of a reenlistment, but with the fact that there was no actual 'termination' of the accused's status as a person subject to military law." *Id.* at 416, 32 C.M.R. at 416. This reasoning would apparently fall into line with the "conditional-discharge/status-hiatus" rule developed in *Solinsky*, but there is language in *Noble* which obscures the facts therein as they relate to the "conditional-discharge/status-hiatus" rule.[8] This confusion was greatly increased when the Court decided *United States v. Steidley*, 14 U.S.C. M.A. 108, 33 C.M.R. 320 (1963).

In *Steidley*, Judge Ferguson, who had dissented in *Noble*, established a strict-line interpretation of the bifurcated test of Article 3(a), U.C.M.J., as the rule of jurisdiction for offenses committed in prior enlistments. Judge Kilday concurred in what seemed to be a reversal of his opinion in *Noble*. This apparent reversal of the Court, and more notably Judge Kilday, was somewhat explained by Chief Judge Quinn's dissent. The Chief Judge felt that the record was too weak and uncertain to support the majority's conclusion that the accused was given an unqualified discharge. The Chief Judge's dissent, thus, illuminates the basis for the majority's strict application of Article 3(a): on the basis of the existing facts, the majority concluded that the accused's discharge was unconditional. How else could nearly fifteen years of legislative and judicial policy remain settled?

The need for a resolution of the apparent conflicts of *Noble* and *Steidley* resulted in the keynote decision of *United States v. Ginyard*, 16 U.S.C.M.A. 512, 37 C.M.R. 132 (1967). There, the accused had been dis-

---

7. *See United States v. Martin*, 10 U.S.C.M.A. 636, 28 C.M.R. 202 (1959). By some judicial interpretations, where a service member was discharged for any reason and subsequently enlisted, regardless of the hiatus in military status, the expansive intention of Congress as noted in Article 3(a), U.C.M.J., preserved jurisdiction for offenses committed during the initial term of military service.

8. Since Noble's two extensions were still in force until he enlisted for another term, *United States v. Solinsky*, 2 U.S.C.M.A. 153, 7 C.M.R. 29 (1953), was distinguished, *and the vitality of the "conditional-discharge/status-hiatus" rule was never specifically addressed.* *United States v. Noble*, 13 U.S.C.M.A. 413, 416, 32 C.M.R. 413, 416 (1962).

charged and reenlisted on the following day, under service regulations providing for a short-term discharge. Judge Kilday/authored the majority opinion and focused his analysis upon the apparent conflict of the opinions in *Noble* and *Steidley*. Judge Kilday noted that *Steidley* presented a factual situation where the accused received an unqualified discharge. *Noble* was cited as the "special" situation which apparently encompassed conditional discharges. Realizing that these disagreements in application of the rule arose from an attempt to determine specific factual situations in each case and relate them to particular service regulations, Judge Kilday formulated a rule to avoid future misunderstandings:

> This, then, is the rule to be followed: *Once an enlisted man has been discharged from the armed forces, that discharge operates as a bar to subsequent trial for offenses occurring prior to discharge, except in those situations expressly saved by Article 3(a) of the Code, supra.*

*United States v. Ginyard, supra* at 516, 37 C.M.R. at 136.

This language seeks to lay down a clear-cut, unambiguous rule of application for personal jurisdiction in circumstances where a discharge has occurred subsequent to the date of the offenses. Indeed, subsequent cases have followed *Ginyard* in a literal, strict application of the rule of statutory, Article 3(a), jurisdiction. *See United States v. Caprio*, 10 M.J. 586 (N.C.M.R. 1980); *United States v. Justice*, 2 M.J. 344 (A.F.C.M.R. 1976). The only noted exception is the aberrant factual circumstance of the "special" case of *Noble.*[9]

A comparison of paragraph 11 of the 1951 and the 1969 *Manual for Courts-Martial* highlights the continuing confusion and strained distinctions which can result from a misapplication of *United States v. Ginyard*. There was little change in the 1969 text from the 1951 paragraph 11*b*, until the fifth (unnumbered) subparagraph exception to the general rule of military jurisdiction:

> ... In those cases when the person's discharge or other separation does not interrupt his status as a person belonging to the general category of persons subject to the code, court-martial jurisdiction does not terminate. Thus when an officer holding a commission in a Reserve component of an armed force is discharged from that commission, while on active duty, by reason of his acceptance of a commission in a Regular component of that armed force, there being no interval between the periods of service under the respective commissions, there is no termination of the officer's military status—merely the accomplishment of a change in his status from that of a temporary to that of a permanent officer—and court-martial jurisdiction to try him for an offense committed prior to such discharge is not terminated by the discharge. *Similarly, when an enlisted person is discharged for the convenience of the Government in order to re-enlist before the expiration of his prior period of service, military jurisdiction continues provided there is no hiatus between the two enlistments.* A member of the armed forces who receives a discharge therefrom while serving without the continental limits of the United States and without the Territories enumerated in Article 2(11), and who immediately becomes a person accompanying, serving, or employed by the armed forces in such an oversea area, remains amenable to trial by court-martial for offenses committed prior to his discharge because such discharge does not interrupt his status as a person subject to the code. So also a dishonorably discharged prisoner in the custody of an armed force may be tried for an offense committed while a member of the armed forces and prior to the execution of his dishonorable discharge....

---

9. Even this exception has been denied efficacy in the Air Force, and Judge Donovan's concurring opinion in *United States v. Caprio*, would apparently deflate *Noble*'s standing in the Navy. *See United States v. Justice*, 2 M.J. 344 (A.F.C.M.R.1976); *United States v. Caprio*, 10 M.J. 586 (N.C.M.R.1980).

Paragraph 11*b, Manual for Courts-Martial, 1951,* (emphasis added).

When the person's discharge or other separation does not interrupt his status as a person belonging to the general category of persons subject to the code, court-martial jurisdiction over him does not terminate. Thus, when an officer holding a commission in a Reserve component of an armed force is discharged from that commission, while on active duty, by reason of his acceptance of a commission in a Regular component of that armed force, there being no interval between the periods of service under the respective commissions, there is no termination of the officer's military status—merely the accomplishment of a change in his status from that of a temporary to that of a permanent officer—and court-martial jurisdiction to try him for an offense committed before the discharge is not terminated by the discharge. Also a discharged prisoner in the custody of an armed force may be tried for an offense committed while a member of the armed forces and before the execution of his discharge.

Paragraph 11*b, Manual for Courts-Martial, 1969 (Rev.).*

The premise upon which this "fifth" exception is based is clearly noted in the first sentence, which is substantially unchanged from the 1951 to the 1969 texts and which clearly reflects much of the preceding legislative and judicial analysis:

"When the person's discharge or other separation does not interrupt his status as a person subject to the general category of persons subject to the code, court-martial jurisdiction does not terminate. . . ."

In the 1951 provision, two pertinent examples of this premise were noted—a Reserve officer on active duty who accepts a commission in a Regular component, and an enlisted person discharged before the expiration of his prior term of service in order to re-enlist. These examples are closely related in terms of policy and personnel procedures, although some differences are necessarily established, *see generally Naval Military Personnel Manual* (NMPM), articles 1030100 to 1050300, (for officers, enlistees, and re-enlistees). However, solely on the basis of the decision in *United States v. Ginyard,* and without any comments, the drafters of the 1969 *Manual* omitted the latter example. Analysis of Contents, Manual for Courts-Martial (1971), D.A. Pamphlet No. 27–2, p. 42.

In view of the focus of the "fifth" jurisdictional exception on the absence of interruption of status as a person subject to the Code, there is no rational basis to differentiate between the two noted examples. In neither instance is the status of a person subject to the general category of persons subject to the code interrupted. Previously cited service regulations specifically address the situation. *See* NMPM, art. 104150f(1) and (2).[10] In light of this premise and the illogical and strained result which occurs when the rule of *United States v. Ginyard* is applied overbroadly in the manner of the *Manual* drafters, we perceive that the rule in *Ginyard* has been misconstrued.

If we applied the rule of *Ginyard* without reference to its origin, following the interpretation of the Air Force Court of Military

---

**10.** The text of this provision provides:

f. Upon the completion of the military service obligation, as specified above, the member shall be discharged or otherwise separated unless he is otherwise obligated to remain in the military service, subject to the following:

(1) The military service obligation is not considered terminated upon discharge or other type of separation for the purpose of immediate reentry into the same or any other component of the Armed Forces, or for the purpose of entry into an officer's training program in which the individual has military status. Any additional service performed after such a discharge or other type of separation shall be counted toward fulfillment of such obligation.

(2) The contractual service obligation incurred by a member is considered terminated upon a discharge for the purpose of a complete separation from military status. Discharge or other separation of a member from the Regular Navy or Naval Reserve prior to the date of completion of a military service obligation will be effected at the discretion of the Commander, Naval Military Personnel Command . . . .

Review in *United States v. Justice, supra,* there would be no jurisdiction in this instance, for appellant could be found to have been discharged, the noted offenses are subject to a punishment greater than five years *and* his offenses of larceny and forgery are triable in state courts.[11] But our reading of *Ginyard,* especially in the long-term perspective of its judicial evolution and especially with the background of noted policy considerations, legislative activities and intentions, does not require this result. Accordingly, we agree with the extensive analysis of Judge Clause in the memorandum decision of *United States v. Horton,* C.M. 43934 (A.C.M.R. 15 March 1982), and read *Ginyard* as a restatement of the basic *Hirshberg* rule, in light of *Toth v. Quarles,* and Article 3(a), U.C.M.J. As noted by Judge Clause, Judge Kilday's analytical treatment of the entire series of decisions from *Solinsky* to *Steidley,* as well as the above noted analysis of the 1951 and 1969 *Manual* provision changes, supports this reading and conclusion that *in personam* jurisdiction over service members is not quashed by a discharge subsequent to the offenses unless that discharge clearly returns the accused to civilian status—even if but for a moment, *i.e.,* where the individual has the choice of remaining a civilian or *reacquiring* military status. Judge Clause's assessment places the rule of *Ginyard* well within the long-standing judicial and legislative analysis parameters based upon military status, and prevents the demoralizing effects which would certainly arise, much as noted in earlier opinions and debates.[12] Such an analysis fairly balances the interests which Congress and the Supreme Court have considered in their doctrinal evolutions

and does not compromise the factual distinctions noted by Judge Kilday in *United States v. Ginyard, supra,* especially as related to the "special" situation of *United States v. Noble, supra.*

Therefore, since appellant's "discharge" was conditional upon his reenlistment, and as a result, his continued status as a member of the armed services subject to the Code never altered, and since this factual circumstance is a noted exception to the strict application of the *Ginyard* discharge test, we find that requisite personal court-martial jurisdiction was retained.

*A fortiori,* since there has been no termination of appellant's military status, the restrictions of the two-pronged test of Article 3(a), U.C.M.J., (that is, a minimum punishment level of five years or more and amenability to trial before courts of the United States or of a State, etc.), do not apply. Inasmuch as Article 3(a) speaks in terms of "termination of [military] status", its strictures do not come into play where there has been no termination of continued status as a member of the uniformed services, *e.g.,* as when a conditional "discharge" is issued upon an obligation of simultaneous reenlistment. The fact that appellant could be tried by the courts of a State for the instant offenses is thus unavailing to deprive the court-martial of jurisdiction over him. Appellant, therefore, falls within the category of persons subject to the Uniform Code of Military Justice as set forth in Article 2, U.C.M.J., 10 U.S.C. § 802. This result comports with statutory intent, prior case law, the needs of the service, and common sense; it gives meaningful substance and mutuality to the true intent of the

11. The bifurcated test of Article 3(a) would prevent the exercise of military jurisdiction since state courts would be empowered to try appellant in this instance. *See* Cal.Penal Code §§ 470; 487 (1975). There is, of course, a great deal of difference between what a state *may* prosecute and what a state *will* prosecute. Practically speaking, in the present circumstance where forged checks and stolen property were integrally connected to military activities and personnel, there is little assurance that civilian jurisdictions will pursue the matter. *See also* paragraph 127c, M.C.M.

12. In this instance, the demoralizing and disruptive effects of allowing a service member to remain in the Marine Corps after stealing from fellow Marines and then forging several checks at military exchanges go without saying. Similar effects elsewhere are a primary concern and must weigh appropriately in any balance-of-interests analysis. We cannot conceive that a contrary result was the intention of Judge Kilday in *United States v. Ginyard, supra.*

parties to the conditional-discharge agreement—that appellant's status as a member of the uniformed services continues unabated in terms of obligations as well as benefits. Assignment of Error I is thus rejected.

Accordingly, the findings and sentence as approved on review below are affirmed.

Senior Judge BAUM and Judge ABERNATHY concur.